**Opinion issued November 21, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-24-00396-CV**
_____

**IN THE INTEREST OF H.M.-W.J. AND E.R.J. A/K/A BABY BOY M., CHILDREN**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00078J**

---

**MEMORANDUM OPINION**

In this accelerated appeal,[1] appellant, father, challenges the trial court's order, entered after a bench trial, terminating his parental rights to his minor children, H.M.-W.J. ("H.J.") and E.R.J., also known as Baby Boy M ("E.J.") (collectively, the

---

[1] *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

"children"), and awarding appellee, the Department of Family and Protective Services ("DFPS"), sole managing conservatorship of the children.[2]  In five issues, father contends that the trial court erred in appointing DFPS as the sole managing conservator of the children and the evidence is legally and factually insufficient to support the trial court's findings that he knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being,[3] he engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being,[4] he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children,[5] and termination of his parental rights was in the best interest of the children.[6]

We affirm.

---

[2]     H.J. was three years old and E.J. was one year old at the time the trial court signed its order terminating father's parental rights.  The trial court also terminated the parental rights of the mother of H.J. and E.J. ("mother"), but she is not a party to this appeal.

[3]     *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[4]     *See id.* § 161.001(b)(1)(E).

[5]     *See id.* § 161.001(b)(1)(O).

[6]     *See id.* § 161.001(b)(2).

**Background**

On January 13, 2023, DFPS filed its original petition seeking termination of father's parental rights to H.J. and managing conservatorship of H.J.[7]  On January 23, 2023, DFPS filed its original petition seeking termination of father's parental rights to E.J. and managing conservatorship of E.J.[8]  Later, the trial court consolidated the two cases into the underlying trial court cause number.

*Removal Affidavit*

At trial, the trial court admitted into evidence a redacted copy of the affidavit of DFPS investigator Alexya Harrison.  Harrison testified that DFPS started investigating mother and father in December 2022 due to allegations of narcotics use.  While those allegations were being investigated, father refused to take a narcotics-use test and refused to sign a safety plan.

Additionally, Harrison testified that on December 25, 2022, DFPS received a referral alleging negligent supervision of H.J. by mother.  The referral stated that mother was engaging in narcotics use and was pregnant with E.J.  It also stated that mother was mentally unstable and her behaviors had become "irate, manic[,] and confrontational."

---

[7]     DFPS also sought termination of the parental rights of mother.

[8]     DFPS also sought termination of the parental rights of mother.

3

Further, according to Harrison, on January 12, 2023, a Child Protective Services ("CPS") investigator made an unannounced visit to the children's maternal grandmother's apartment related to another case involving mother's brother and his child. During the visit, the CPS investigator saw narcotics paraphernalia "wax all over the house including pin[n]ed to [the] walls." (Internal quotations omitted). There were also "open baggies of [m]arijuana" present. H.J. was found to be living at the apartment with mother. While the CPS investigator was at the apartment, father arrived and spoke to her. Father admitted to smoking marijuana. Mother's brother was arrested by law enforcement officers after admitting "to having dope" in the home. (Internal quotations omitted.)

Harrison testified that she also went to the maternal grandmother's apartment on January 12, 2023. Upon arrival, the CPS investigator told Harrison that she had seen "a drug called 'wax' in the living room and also in the bedroom of the home." Mother's brother admitted to having narcotics in the home, and mother and father admitted to using marijuana. While at the home, Harrison found "the home environment to be deplorable." "[T]here was a smell of [m]arijuana and animal feces." H.J. was wearing clothes that did not fit him. He had red marks on his face, and his clothes were "filthy." H.J. "had a foul smell emanating from his body[,] and his diaper was soiled." H.J.'s appearance provided "clear signs of neglect." Mother told Harrison that father knew she was not supposed have unsupervised possession

4

of H.J. Father then cursed at mother, telling her to "[s]hut the fuck up." (Internal quotations omitted.) And he told Harrison that he did not know he was supposed to supervise mother's contact with H.J. Harrison was concerned with H.J. having been exposed to narcotics use.

Harrison further testified as to certain CPS history involving mother and father. For instance, on August 10, 2022, law enforcement officers were dispatched to a home due to a disturbance. Father had pushed his way into the home and assaulted mother when she answered the door. Mother was holding H.J. at the time, but H.J. did not sustain any injuries. Father was charged with the offense of criminal trespass because of his actions.

### DFPS Caseworker Lozano

Jeanette Lozano testified that she was the DFPS caseworker assigned to the children's case, and she had been involved in the case since March 2023. According to Lozano, DFPS's goal for the children was an unrelated adoption. DFPS was requesting that the trial court terminate the parental rights of both mother and father.

As to father's narcotics use, Lozano testified that one of DFPS's primary concerns with father was his narcotics use. Father had been given a Family Service Plan ("FSP") in March 2023, but father still needed to successfully complete his substance abuse group counseling and individual counseling requirements. Lozano agreed that father had stated that he had completed his counseling requirements, but

5

she had not received any certificates showing his successful completion of counseling. Father's progress reports from counseling showed that he had been actively engaged in counseling.

Lozano further testified that father had not demonstrated consistent sobriety throughout the pendency of the case. Lozano was concerned that father did not seem to have "a plan in place to help him prevent any relapses," and father had never "articulate[d] any[] . . . plan to keep himself sober." Lozano stated that father had not consistently tested negative for narcotics use during the pendency of the case, and he did not attend all the required narcotics-use testing. Further, at a test in November 2023, the urine sample provided by father was found not to belong to him. DFPS was concerned about returning the children to father's care because he had not provided proof of consistent sobriety. According to Lozano, father had admitted to using narcotics during the pendency of the case; and he tested positive for methamphetamine use "all the way up until October [2023]." Nevertheless, Lozano acknowledged that father's narcotic-use-testing results from February 2024 were negative. According to Lozano, if father were to relapse or engage in narcotics use while the children were in his care, the children's needs would go unmet. In Lozano's opinion, father needed to show that he was sober for at least six months before the children could be returned to his care.

As to father's home, Lozano explained that she had visited his trailer home in February 2024. Father did give Lozano a copy of the lease agreement for the lot of land where his trailer home was located, but the lease agreement was not signed by the lessor and did not provide any information for the lessor. Lozano had requested that father provide her with information so that DFPS could verify that his trailer home was properly located on that lot of land, but father had not yet provided it.

Lozano also testified that father's trailer home was clean and had electricity, and she did not have any major concerns about the condition of the trailer home itself. The condition of the trailer home was "adequate," but she noted that the home was setup for a single adult and did not appear to have any "accommodations or provisions for the children." Lozano further explained that father had been living in the same trailer home since the beginning of the case; however, during the case, he had been evicted from the property where his trailer home was previously located. Lozano explained that father had more than a year to prove that he could provide a safe and stable home for the children, and he had failed to do so.

As to father's employment, Lozano stated that she was not satisfied with the proof of employment provided by father. Father had provided her with a "pay stub" in October 2023 when he was "working for a company." But he then became self-employed. Father then gave her "invoices of job sites" where he had been working, but she was unable to verify the invoices that father had provided. In

Lozano's opinion, father had not provided her with consistent pay records during the pendency of the case.

Lozano was also concerned with father's criminal history because it indicated that he lacked an ability to refrain from criminal conduct. Lozano testified that father "picked up" a new criminal charge in January 2023, but it was later dismissed. And father did not have any other criminal cases pending for the remainder of the case. However, Lozano noted that in 2021 father was "arrested for trespassing," and he went to jail "for [twenty-two] days."

Further, Lozano explained that mother and father had an altercation after a visit with the children during the case. "The visitation monitor was driving behind" mother and father after a visit, and she saw "hands . . . going back and forth between" mother and father. She also saw mother grab the steering wheel, which made the car go "to the left side of [a] busy street." Mother then got out of the car and started walking down the street. Lozano later spoke to mother about the incident, and she did not deny it occurring.[9]

---

[9]     As to that incident, mother testified at trial that she and father left a visit with the children in the same car. Mother had a ride waiting for her at a McDonald's restaurant, so she "got out at the red light because it was more convenient than having to [do] a big U-turn because of all the rodeo traffic." She stated that she did not "jump out of" father's car.

As to father's visits with the children, Lozano testified that they began in March 2023,[10] and father brought things for H.J. At other visits during the case, Lozano noted that some clothes that were brought for H.J. were the wrong size. Lozano did not see anything being brought for E.J. at visits. But since January 2024, it seemed that father was trying to focus his attention more on E.J. Lozano had seen that father was bonded with the children and that father was making an effort with the children to try and get them returned to his care.

As to the children's current placement, Lozano explained that the children were placed together in a foster home, where they were doing well. The children had been in the same foster home since they entered DFPS's care. The children's foster home was the only home that E.J. had ever known.[11] The children had never expressed that they were unhappy in their foster home.

Lozano also noted that when H.J. was first placed in the foster home, he had "a lot of redness and dry patches on his face" and on his back. There was "sort of like an eczema texture on his skin," and H.J. had "a lot of scars on his chest and on

---

[10]    Initially, father's visits with the children were supervised and supposed to occur weekly for two hours each time. In July 2023, father's visitation schedule was changed to twice a month for two hours each time. Father was ordered to confirm his attendance twenty-four hours before a scheduled visit with the children. Father was also supposed to notify DFPS when he was enroute to a visit. If father did not show up for a visit with the children without providing advanced notice, his visits with the children were to be suspended.

[11]    Lozano noted that it would have been more difficult to E.J. to be bonded with father because immediately following his birth, E.J. entered DFPS's care.

his shoulders, possibly due to scratching" his dry skin. H.J.'s foster mother told Lozano that she would put lotion on H.J. every day, and when Lozano saw H.J. about a week or two later, the redness and dry patches were cleared up.

At the time of trial, H.J. was three years old, and he was able to say words. He asked for what he wanted and what he needed. He had been fully potty trained, and he knew his numbers and colors. E.J. was one year old at the time of trial, and he could fully walk. The children had two foster siblings. When Lozano visited the foster home, H.J. appeared to be very bonded with his foster siblings, and E.J. appeared to be bonded with everyone. At visits, Lozano saw H.J. talking with his foster siblings and E.J. H.J. would share his toys, and his foster siblings would share their toys with him. The children's foster siblings also assisted the children with getting snacks or if they asked for something.

Lozano further testified that the children's foster home was a single-story home, with four bedrooms, an open living room, and a kitchen. The children shared a bedroom. The home sat on a large property. Lozano did not have any concerns about the foster parent's ability to care for the children, and according to Lozano, the foster home was the only safe and stable home that the children had ever known. It would be detrimental to the children to remove them from their foster home.

As to the children's foster parents, Lozano stated that they had not been arrested during the pendency of the case, and they were able to meet the children's

emotional, physical, and medical needs. There was no evidence of domestic violence or narcotics use by the children's foster parents, and the foster parents did not have a criminal history.

Lozano noted that DFPS had considered the children's paternal grandmother, Tanya Stevens, as a possible placement for the children, but DFPS had concerns about Stevens's narcotics use. Stevens participated in narcotics-use testing, and the testing by hair follicle was positive for narcotics use. Stevens had attended visits with the children during the pendency of the case, and Lozano had seen her making an effort with the children "[l]ike [she] care[d] about" them. Although it appeared that father was making an effort to have the children returned to his care and that he had family support, DFPS still recommended that father's parental rights be terminated.

### *Child Advocates Representative Smith*

Child Advocates, Inc. ("Child Advocates") representative Margaret Smith testified that she had been assigned to the children's case in March 2023. At the time Smith was appointed by the trial court, the children had already been removed from the care of mother and father. Smith had visited the children at their foster home and monitored supervised visits between the children and mother and father.

As to the allegations that led to the children entering DFPS's care, Smith explained that it was the result of "meth use" by mother and "deplorable conditions."

11

According to Smith, during the pendency of the case, mother had admitted using methamphetamine while pregnant with E.J.

Smith also testified that based on her experience and knowledge of the case, she believed it was in the children's best interest to terminate the parental rights of mother and father. In doing so, the children would have a "chance of permanency and consistency in their future life." Smith generally expressed concern about non-specific narcotics use by both mother and father and noted that the children needed a stable living environment. According to Smith, mother had "been at multiple homes" during the pendency of the case, and although father "had a residence" for most of the case, Smith recently "s[aw] an eviction notice." Smith agreed that father "own[ed] his own trailer" home, but she stated that, during the pendency of the case, father's employment had "ebb[ed] and flow[ed]." In her opinion, he had not maintained stable, consistent employment during the case.

As to mother's and father's narcotics use, Smith testified that in "the last few months of 2023," mother and father had tested negative for narcotics use. As far as Smith knew, mother had not used narcotics since September 2023.

Smith further stated that at visits with the children either mother or father would bring food for H.J., but Smith could not recall which parent brought the food. Smith also could not recall whether mother or father ever brought meals for E.J.— who was an infant. At certain visits, mother and father brought clothes and shoes

12

for the children, a backpack for H.J., and art supplies. They also brought diapers for E.J. Smith noted that there may have been other things that mother and father brought for the children that she "could have missed." At visits, father would primarily interact with H.J. because he was older and not an infant. Father and H.J. were bonded. Smith also noted that E.J. was never in father's care because he was placed in DFPS's custody after his birth. E.J. never lived with father, but father and H.J. had a life together before DFPS's took custody of H.J. Father would sometimes bring Stevens, the children's paternal grandmother, to visits with the children. Neither mother nor father ever interacted inappropriately with the children at visits. And father participated in his visits with the children and showed up for his visits with the children.

As to the children's current placement, Smith testified that the children were placed together in a foster home, and they are doing well in the home. The children had been in their placement for about one year. The children's foster parents were planning birthday celebrations for the children's birthdays. H.J. had been enrolled in a daycare program while in the foster parents' care. The foster parents planned on taking trips with the children, and H.J. received a bike and a helmet from his foster parents for a Christmas present. Smith also noted that the foster parents had two additional children—a girl and a boy who were approximately five years old and ten years old. They had a sibling-like relationship with the children.

13

According to Smith, the children's physical and emotional needs were being met in their placement, and the children did not have any specialized needs. The children shared a bedroom in their foster home. E.J. slept in a crib with no pillows for his safety. H.J. had a toy chest in the bedroom, and E.J. also had baby toys and chewing toys because his teeth were coming in. In Smith's opinion, the children were bonded with their foster parents and their foster siblings. The children's foster parents had expressed an intention to adopt the children. Smith stated that to her knowledge no one in the children's placement was using narcotics or "going to jail." The children's current placement was the only safe and stable home that they had ever known, and Smith believed it would be determinantal to the children if they were removed from their foster parents' care.

*Father*

Father testified that he was the children's father. He was twenty-eight years old, and the children were his only children. When the case began, E.J. had not yet been born. But after his birth, he immediately went into the care of DFPS. E.J. had never lived with father.

Father also explained that H.J. was two years old when he entered DFPS's care. Before entering DFPS's care, H.J. lived with father in father's trailer home. When father was working, H.J. would spend time with Stevens, his parental grandmother; H.J. never lived with Stevens though. Father did not allow H.J. to be

14

around mother a lot during that time because she was in a "custody battle" with the father of her other children, and father was worried about H.J.'s safety if he was around mother or the father of mother's other children.

Father further testified that H.J. entered DFPS's care in January 2023 after father "dropped [H.J.] off to visit . . . mother," and according to DFPS, father had put H.J. in danger by doing so. Father stated that before he left H.J. with mother for a visit at the children's maternal grandmother's apartment, he went inside and inspected the home. It was clean; there were child locks on the cabinets and locks on the doors. At the time, mother was pregnant with E.J., and as far as father was aware, "everything was fine." Mother, the children's maternal grandmother, and mother's fifteen-year-old brother were at the apartment when father dropped H.J. off. Mother had told father that her other brother, whose background father was concerned about, would not be at the apartment while H.J. was there. During H.J.'s visit, mother sent father a videotaped recording of H.J. playing with his cousin. In the recording, H.J. was happy and dressed well. Father felt like H.J. was safe, and he knew that mother had not seen H.J. in a long time. Father was later told that "there w[ere] drugs everywhere [in the apartment] and [they were] stapled to the wall or something."

Father explained that he returned to the maternal grandmother's apartment once mother called him to pick up H.J. When father got to the apartment, mother's

15

brother was there as well as mother, Stevens, an investigator from CPS, and law enforcement officers. The CPS investigator and officers were present because of mother's brother's child. Ultimately, H.J. was taken out of father's and mother's care that day. At that time, father did not know that mother was using narcotics.

Additionally, father testified that he received an FSP, and he had completed its requirements. Based on his FSP, the biggest issue that father needed to address was his narcotics use. Father participated in narcotics-use testing during the pendency of the case, but he noted that he did not show up for all required narcotics-use tests. Father also stated that he had participated in a substance abuse assessment, and because of the substance abuse assessment, father was required to engage in group counseling and individual counseling. Father began participating in counseling, which, according to father, he had completed. He had been successfully discharged from individual counseling, and as to group counseling, father stated that had completed his counseling sessions and he would be successfully discharged as soon as his latest narcotics-use-testing results were received. He expected that to occur within the next week.

Father also stated that he attended church to "seek [his] sobriety," and he had a support group at church. He did not have an Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA") sponsor, though he had been ordered to attend AA and NA meetings. Father stated that he had attended a few AA meetings with

16

Stevens, the children's paternal grandmother, but it was "not for [him]." Father acknowledged that during the pendency of the case, he had tested positive for narcotics use,[12] but his last narcotics-use-testing results had been negative for narcotics use. According to father, he had not used methamphetamine since October 2023. Through counseling, father had learned tools to stay sober. He knew that he needed to keep himself away from certain people, and he needed a good environment for the children. Father stated that he had a "relapse prevention plan," but it was not written down. At trial, father stated that he was sober.

Father further testified that he had engaged in criminal conduct in the past. For instance, in 2022 he "spent four days in jail for a felony theft." And in 2021, father spent twenty-two days in jail related to "another misdemeanor."

As to his housing, father testified that he owned a trailer home, and he "rent[ed] a lot" from a man. He had provided DFPS with a lease agreement, and a DFPS caseworker and a Child Advocates representative had a home visit at father's trailer home. Father also "provide[d] [to DFPS] statements of the payments" that he had made for renting the lot. Father noted that he had previously lived at a recreational vehicle ("RV") park, named "Palms RV." Father was not evicted from his trailer home ever, but the Palms RV park told him, he had to move his trailer

---

[12]     Father also acknowledged that using methamphetamine constituted engaging in criminal conduct.

home because he had not paid rent. Father then moved his trailer home to its current lot.

As to his employment, father stated that he was self-employed as an electrician. He had provided DFPS with "[r]eceipts of payments," meaning receipts that he had written to customers. According to father, he earned about $3,000 per month. Father reported that he did electrical work for the Palms RV park, and he was on good terms with them.

As to his visits with the children, father testified he attended joint visits with mother because the children's "foster parents had requested that the visits be at the same time to be less disruptive on the [children]." The children's paternal grandmother, Stevens, also attended the visits with father every other week. Father stated that he had not had any altercations with mother at their joint visits with the children. There were instances during the visits where father "had to step away" though. Father noted that he had completed his required parenting classes, and his visits with the children went well. Father acknowledged that he had been late to three visits with the children during the pendency of the case.

As to H.J., father stated that he was father's "little buddy." He was very close with H.J., and he was working on his bond with E.J. Father had made sure to spend more time with E.J. at visits to build a bond with the child. Father had visits with the children every other week, and he had only missed one visit. According to father,

that visit was scheduled outside of the normal visitation schedule, and he did not receive a text message about the visit. Ultimately, the visit was canceled because father did not respond soon enough. Father was disappointed to have missed a visit with the children because he "enjoy[ed] every moment" with the children, and he did not want the cancellation to be held against him. Father wanted the children returned to his care.

As to the children's best interest, father stated that it was in their best interest to be returned to father's care because he "c[ould] give them the life that they need[ed]." He did not want "someone else [to] raise" his children. If the children were returned to his care, father planned on getting a larger home. Father was not opposed to the children's foster parents remaining in the children's lives if the children were returned to father's care.

Finally, father explained that he was no longer in a relationship with mother, and there was no chance that they would be in a romantic relationship in the future. But if the children were returned to the care of mother and father, they would co-parent together. Father believed that mother had been sober since September 2023, and he did not think that she had used narcotics recently or relapsed. Father understood that it would be difficult to parent the children if he was using narcotics, and he knew that he needed to stay narcotics free.

***Paternal Grandmother***

Stevens testified that she was the children's paternal grandmother and father's mother. Stevens explained that before entering DFPS's care, H.J. visited her a lot, but he never lived with her. According to Stevens, in the three months before he entered DFPS's care, H.J. "stayed with [her] a lot of times."

Stevens further explained that on the day that H.J. entered DFPS's care, she went to the children's maternal grandmother's apartment where H.J. was visiting mother. Mother called Stevens after a CPS investigator arrived at the apartment to perform a welfare check on mother's niece. H.J. was not living at the maternal grandmother's apartment; he was living with father. According to Stevens, the apartment was not "deplorable." "[I]t was a little bit untidy," but the living room and the kitchen "looked decent to [her]." Stevens did not see any narcotics paraphernalia in the apartment. H.J. looked like "he had been playing." Father also came to the maternal grandmother's apartment after the CPS investigator arrived. According to Stevens, as soon as mother "knew that something was wrong," she called father and Stevens to come get H.J.

As to father, Stevens testified that father had "a substance abuse problem," which she learned about in 2019. And father had a "criminal history involving

substance abuse[].”[13]  However, Stevens explained that father had "straightened up his life," and she believed that he no longer used narcotics.  Father attended a few AA and NA meetings with her.  Stevens noticed that father had started making changes in his life a few months before trial.

Stevens further testified that father was working hard.  Father was self-employed doing electrical work, and he owned a trailer home.  He had moved his trailer home to a new property "to get . . . a better environment" for the children.  The trailer home now had a fenced-in yard.  He loved the children, and his "attitude ha[d] changed."  Father lived by himself and was not in a relationship with mother.  Stevens stated that she was not aware "of a default judgment that was entered against [father] in December of 2023 for not paying rent at [the] Palms RV Trailer Park."

As to the children, Stevens agreed that they needed to be "parented by parents who [were] sober," and they needed "parents who c[ould] provide a safe and stable home environment for them."  Stevens believed that H.J. should be returned to the care of father.  Stevens had attended visits with the children during the pendency of the case.

---

[13]  Stevens also testified that she had used methamphetamine in the past and she tested positive for methamphetamine use during the pendency of the case.

*Mother*

Mother testified that she was the children's mother. At the time H.J. entered DFPS's care, mother was living with her mother—the children's maternal grandmother—along with mother's two brothers. On the day H.J. entered DFPS's care, a CPS investigator came to the maternal grandmother's apartment to perform "an unannounced visit" related to mother's brother and his daughter—mother's niece—because of concerns about narcotics use by mother's brother. At the maternal grandmother's apartment, the CPS investigator found narcotics paraphernalia in mother's brother's room. Mother thought that either "baggies of marijuana" were found or that her brother had admitted to having methamphetamine in the apartment. Mother disputed that the condition of the apartment was "deplorable" and that "there were drugs all over the place." But she noted that her brother had "paper wrappers stapled to the walls [of his room] that he [would] buy[] . . . to roll [marijuana] in" "[a]s decoration." Mother stated that she called father to come get H.J. after narcotics paraphernalia was found.

According to mother, H.J. was simply with her at the maternal grandmother's apartment at the time the CPS investigator visited; he was not living there. He had stayed with her at the apartment the previous night and during that day because father had to work, and the children's paternal grandmother was in the hospital. Father had

22

dropped H.J. off the night before because he had to go to work in the morning. H.J. did not live with mother at the time he entered DFPS's care.

Mother further noted that, at the time that H.J. entered DFPS's care, she denied that she was using narcotics, and she did not submit to narcotics-use testing until E.J. was born in January 2023. E.J. entered DFPS's care a couple days after he was born. As to her narcotics use, mother testified that she had used methamphetamine in December 2022 while she was pregnant with E.J.

As to father, mother stated that they were not in a romantic relationship, but they got along. They had a co-parenting relationship. During the pendency of the case, mother and father had joint visits with the children because DFPS requested joint visits as it was more convenient for the children. According to mother, father was "an amazing father." He loved the children, and the children adored him. Father played with the children, and at the last visit, E.J. "could not stop clinging onto him." Mother noted that she had seen a positive change in father. She believed that he was committed to maintaining his sobriety. Mother was not scared for her physical safety when she was with father.

### Father's FSP

The trial court admitted into evidence a copy of father's FSP dated February 29, 2023. The FSP lists "[f]amily [r]eunification" as DFPS's primary permanency goal as well as "[r]elative/[f]ictive [k]in[] [c]onservatorship" as a concurrent

23

permanency goal. As to "hopes and dreams" for the children, the FSP states "[f]or the children to be able to achieve stability and have the skills to achieve what they desire."

As to H.J., the FSP states that he had no developmental concerns or emotional or behavioral health issues. H.J. did not display any delinquent behavior. He was living in a foster home and was not yet old enough to attend school.

As to E.J., the FSP states that he had no developmental concerns or emotional or behavioral health issues. E.J. did not display any delinquent behavior. E.J. tested positive for methamphetamine at birth and was living in a foster home. He was not old enough to attend school.

As to father, the FSP states that he appeared to be in overall good health and did not display any cognitive or developmental disabilities. Whether father had a support system was unknown.

In discussing the concerns that father needed to address, the FSP notes that the children lacked proper supervision while in mother's care and mother tested positive for methamphetamine while pregnant with E.J. On January 12, 2023, H.J. was found to be living with mother and mother's brother with "visible drug paraphernalia and baggies of marijuana inside the ho[me]." On January 19, 2023, E.J. tested positive for methamphetamine at birth. According to the FSP, father was not protective of H.J. because he left the child unsupervised with mother.

The FSP also notes that father had "not displayed the ability to provide basic needs and care for the children" and he had displayed "patterns that prohibit[ed] him [from] effectively support[ing] his children's learning, growth and development."

Father's FSP required father to "maintain stable housing that [was] sanitary and free from any drugs and hazardous objects" and "provide proof of housing with a lease agreement to" the DFPS caseworker. Father was also required to "maintain legal employment and provide [the DFPS] caseworker with proof of stable and consistent [employment] documentation such as paycheck stubs" and "provide any proof of documentation of any additional sources of income, such as governmental assistance." Additionally, the FSP required father to "participate in a[n] [eight-]week parenting course that w[ould] assist him with understanding [the] children's growth and development" and he was required to "provide proof of [a] certificate of completion once he ha[d] received it." Further, father was required to "maintain monthly contact with [the DFPS] caseworker and provide [his] most up to date method of contact"; if his contact information changed, father was to "notify [the DFPS] caseworker with his updated information within [twenty-four hours]" of the change. Father was also required to "participate in all case related events[,] such as court hearings, meetings, conferences and visitation appointments with the children" and he was to "refrain from any illegal and criminal activity." And father's FSP required him to "participate in a substance abuse assessment and follow all

25

recommendations," "participate in random hair follicle and urine analysis drug testing throughout the duration of the case," and "participate in a psychological assessment and follow all recommendations from the assessment."

### Father's Narcotics-Use-Testing Records

The trial court admitted into evidence a copy of father's narcotics-use testing results. The testing results show that on February 6, 2023, father, by hair-follicle testing, tested positive for methamphetamine and marijuana, and father, by urinalysis, tested positive for amphetamine, methamphetamine, and marijuana. Further, on July 12, 2023, father, by hair-follicle testing and urinalysis, tested positive for amphetamine, methamphetamine, and marijuana.

The testing results also show that father failed to participate in narcotics-use testing on March 7, 2023, and on November 1, 2023, father substituted his urine sample with a urine sample from another person, which resulted in a positive test result.

### Father's Criminal History

The trial court admitted into evidence of a copy of a judgment of conviction, entered on June 8, 2017, showing that father pleaded guilty to the felony offense of possession of a controlled substance, namely methamphetamine, weighing less than

one gram,[14] and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for 180 days. Father received a jail time credit of seventy-six days.

Further, the trial court admitted into evidence a copy of a judgment of conviction, entered on April 3, 2018, showing that father pleaded guilty to the misdemeanor offense of theft,[15] and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for thirty days. Father received a jail time credit of seven days.

The trial court also admitted into evidence a copy of a judgment of conviction, entered on October 26, 2018, showing that father pleaded guilty to the misdemeanor offense of burglary of a vehicle,[16] and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for sixty-nine days. Father received a jail time credit of twenty-three days.

---

[14]  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (b) (offense constitutes state jail felony).

[15]  *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(2).

[16]  *See id.* § 30.04(a), (d).

*November 1, 2023 Permanency Hearing*

The trial court admitted into evidence a copy of the transcript from the November 1, 2023 permanency hearing in this case.[17] At the hearing, DFPS caseworker Lozano testified that the children were placed in the same foster home, where they were doing great. The children were "meeting their milestones and achieving any goals that their age would require." At the time, H.J. was two years old and did not have any special needs. He attended a daycare program during the week. On the weekend, H.J. attended church with his foster family. On weekends or holiday breaks, the foster family would go to the lake, to the beach, to the pool, or to the park. The foster parents involved H.J. in recreational activities that were appropriate for his age.

Lozano further testified that E.J. was about nine-months old at the time of the permanency hearing, and he did not have any special needs. His teeth were starting to come in, and he was standing on his own with the assistance of furniture. E.J. could crawl very fast, and the foster parents believed that E.J. would be walking soon.

According to Lozano, the children's foster parents were able to meet the children's medical, physical, and emotional needs. The children were bonded with their foster siblings, and Lozano did not have any concerns about the foster home.

---

[17] Father did not attend the November 1, 2023 permanency hearing.

As to father, Lozano testified that father had not consistently participated in the required narcotics-use testing during the pendency of the case. In July 2023, the trial court ordered father to participate in narcotics-use testing, and he tested positive for amphetamine, methamphetamine, and marijuana. Further, after being ordered in July 2023 to participate in narcotics-use testing, father did not do so consistently. The first time that he reengaged in narcotics-use testing after July 2023 was on October 25, 2023. At that time, father tested positive, by hair-follicle testing, for amphetamine, methamphetamine, and marijuana.

As to visits with the children, Lozano stated that mother and father's visits with the children were going well, but mother and father did not arrive on time to their visits. Father showed up thirty-minutes late to visits.

Child Advocates representative Smith testified that she had met with the children "[m]any times." E.J. had become a fast crawler and had "spunk." He could "get smiles out of anyone." H.J. loved E.J. and was very helpful to E.J. H.J. called his foster siblings by their names and seemed to enjoy his foster siblings. Smith did not have any concerns about the children in their foster home.

Stevens, the children's paternal grandmother, testified that before entering DFPS care, H.J. lived with her for three months. But when Stevens had to go to the hospital, H.J. went to live with father. At that time, Stevens was aware that father

had been abusing narcotics "for many years" and that father was actively using narcotics when she sent H.J. went to live with him.

Mother testified that the last time she used narcotics was on September 10, 2023. That was also the date that mother and father ended their romantic relationship. Mother admitted that she used methamphetamine while pregnant with E.J.

### Father's Friend

Lacey Farrow testified that she had known father since "late 2018," and they had been friends since then. However, recently, in February 2024, they decided to start dating. According to Farrow, father had been "working on his sobriety" and was "sober now." Farrow believed that father was sober because "for the last two months" they had spent time together "nonstop." Farrow had never used narcotics. Farrow also explained that she had observed father participating in substance abuse counseling, and father had been "discharged from both counseling sessions." Farrow believed that father was committed to his sobriety.

Additionally, Farrow noted that she had an eight-year-old daughter, and father spent time with Farrow's child. Father was "great" with the child. Before H.J. entered DFPS's care, Farrow had seen father interact with H.J. Farrow described father as "a great father." He was "very interactive" and made sure that H.J. was fed

30

and clothed. Father loved the children, and he would be devasted if his parental rights to the children were terminated.

As to the future, Farrow explained that she and father had discussed "getting a bigger trailer [home] on his lot or possibly moving to a bigger trailer [home]" so that they could move in together. They had also discussed "future plans of moving and renting houses and . . . flipping houses and stuff like that." They planned to have a safe and stable environment for the children.

### *Foster Dad*

The children's foster dad testified that the children had been living in their foster home for about fourteen months. The children were doing well in their foster home. The children called their foster parents "Mom and Dad," and the foster parents loved the children.

As to H.J., the foster dad testified that when H.J. entered the foster parents' care, he had minor rashes on his face and body, so the foster parents took him to the doctor, and the children's foster mother used "lotions and other things" to heal the rashes. H.J. also had anger issues when he first entered the foster parents' care; he would throw himself down, bang his head, and hit stuff. H.J. still did that "a little bit here and there," but "for the most part, he[] [was] doing really, really well" in the home. The foster dad stated that H.J. was an intelligent child.

31

As to E.J., the foster dad testified that E.J. entered the foster parents' care as a newborn, and the foster home was the only home that E.J. had ever known. E.J. was a happy child.

While the children had been in the foster parents' care, the foster parents had attended all court hearings and family group conferences. The foster parents had also taken the children to their scheduled visits with mother and father. The children's foster dad noted that he was employed "build[ing] process control systems," and his income was sufficient to support the family. The foster parents owned their home, which sat on a couple acres of land.

The children's foster dad also noted that he and the foster mother had two biological children, who were bonded with the children. They were the children's siblings. If mother's and father's parental rights were terminated, the foster parents wanted to adopt the children, which the foster dad believed was in the children's best interest. The foster parents planned on raising the children and loving them. They hoped to start contributing to a college fund for the children once they were adopted.

## Termination of Father's Parental Rights

In his second and fourth issues, father argues that the trial court erred in terminating his parental rights to the children because the evidence is legally and factually insufficient to support the trial court's finding that he engaged, or knowingly placed the children with persons who engaged, in conduct that

endangered their physical or emotional well-being and termination of his parental rights was in the best interest of the children.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (b)(2).

A parent's right to "the companionship, care, custody, and management" of his children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted).  The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [his] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights."  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted).  Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20.  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction

as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we

must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact. *See id.*; *Tex. Dep't of*

35

*Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren's] best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangerment

In his second issue, father argues that the evidence is legally and factually insufficient to support the trial court's finding that he engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being because the trial court's finding "was undoubtedly based on appellant's alleged drug use and criminal history" and there was no "evidence that such alleged conduct endangered [the] children." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the[ir] physical or emotional well-being." *Id.* Within this context, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, to "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Id.* (internal quotations omitted); *see also Walker v.*

*Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

We must look at a parent's conduct standing alone, including his actions and omissions. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). It is not necessary to establish that a parent intended to endanger the children. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *14 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). But termination of parental rights requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re L.M.N.*, 2018 WL 5831672, at *14; *In re J.W.*, 152 S.W.3d at 205. The specific danger to the children's well-being may be inferred from parental misconduct, even if the conduct is not directed at the children and the children suffer no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re L.M.N.*, 2018 WL 5831672, at *14; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Courts may consider parental conduct that did not occur in the children's presence, including conduct that occurred after the children were removed by DFPS. *In re L.M.N.*, 2018 WL 5831672, at *14; *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

A parent's narcotics use can qualify as a voluntary, deliberate, and conscious course of conduct that endangers the children's well-being. *In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *12 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.); *In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *30 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op.); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied); *In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). And continued narcotics use after the children's removal from the parent's care is conduct that jeopardizes a parent's parental rights and may be considered as establishing an endangering course of conduct. *In re D.J.G.*, 2023 WL 3513143, at *12; *In re T.S.*, 2022 WL 4474277, at *30; *In re C.V.L.*, 591 S.W.3d at 751; *In re S.R.*, 452 S.W.3d at 361–62; *see also Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (considering conduct jeopardizing parental rights as part of course of conduct endangering well-being of child). When "a parent engages in [narcotics] use during the pendency of a [termination-of-parental-rights case], when he knows he is at risk of losing his children, the evidence is legally sufficient to support a [trial court's] finding of endangerment." *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.); *see also In re D.J.G.*, 2023 WL 3513143, at *12; *In re T.S.*, 2022 WL 4474277, at *30; *In re R.S.*, No.

01-20-00126-CV, 2020 WL 4289978, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("Parental [narcotics] use remains endangering conduct even if the child was not in the parent's custody when the [narcotics] use occurred."); *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Because the evidence showed that the [parent] engaged in illegal [narcotics] use during the pendency of the termination suit, when he knew he was at risk of losing his children, we hold that the evidence is legally sufficient to support a finding of endangerment."). Further, when the evidence shows that the parent engaged in narcotics use during the pendency of the termination-of-parental-rights case, and no evidence directly contradicts that, the evidence is factually sufficient to support the trial court's endangerment finding. *See In re D.J.G.*, 2023 WL 3513143, at *12; *In re A.M.*, 495 S.W.3d at 580; *see also In re D.D.M.*, 2019 WL 2939259, at *5.

DFPS caseworker Lozano testified that DFPS's primary concern with father was his use of narcotics. Lozano stated that father had not consistently tested negative for narcotics use during the pendency of the case, and he did not attend all required narcotics-use testing while the case was pending. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics); *see also In re D.J.G.*,

2023 WL 3513143, at *12–13 (parent's failure to submit to all required narcotics-use testing relevant to whether evidence was sufficient to support finding parent engaged in endangering course of conduct); *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *13 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (considering parent's failure to submit to narcotics-use testing during course of case when holding evidence legally and factually sufficient to support finding parent engaged in conduct that endangered child's physical and emotional well-being). According to Lozano, father also admitted to using narcotics during the pendency of the case, and he tested positive for methamphetamine "all the way up until October [2023]."[18] Further, at a narcotics-use test in November 2023, father provided a urine sample that was determined not to have belonged to him, resulting in a positive testing result. *See In re A.L.S.*, 660 S.W.3d 257, 274 (Tex. App.—San Antonio 2022, pet. denied) (considering parent "used fake urine to falsify drug tests" in holding evidence legally and factually sufficient to support finding parent engaged in conduct that endangered children). Although Lozano acknowledged that father had tested negative for narcotics use in February 2024, she stated that father did not seem to have "a plan in place to help him prevent any relapses" and he had never "articulate[d] any[] . . . plan to keep himself sober."[19]

---

[18]    The children entered DFPS's care in January 2023.

[19]    Father testified that he had been ordered to attend AA and NA meetings, but they were "not for [him]," and he did not have an AA or NA sponsor. Instead, he

The copy of the transcript from the November 1, 2023 permanency hearing, which the trial court admitted into evidence, also indicates that father did not consistently participate in narcotics-use testing during the pendency of the case. Lozano testified at that hearing that father was ordered to participate in narcotics-use testing in July 2023, and he tested positive for amphetamine, methamphetamine, and marijuana. After being ordered in July 2023 to participate in narcotics-use testing, father failed to do so consistently. According to Lozano, the first time that father reengaged in narcotics-use testing after July 2023 was on October 25, 2023. At that time, father tested positive for amphetamine, methamphetamine, and marijuana.

At trial, father testified that the biggest issue he needed to address was his narcotics use. Although father stated that he had participated in narcotics-use testing during the pendency of the case, he noted that he did not show up for all the required narcotics-use testing. *See In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *see also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (fact finder could infer parent's failure to submit to court-ordered narcotics-use testing indicated she was avoiding testing because she

___

attended church to "seek [his] sobriety." According to father, he had a "relapse prevention plan," but it was not written down.

41

was using narcotics). Further, father agreed that he had tested positive for narcotics use during the pendency of the case, but he asserted that his last test result was negative for narcotics use. According to father, he stopped using methamphetamine in October 2023, yet that means that father was using methamphetamine prior to October 2023 and during the pendency of the case, which began in January 2023.

The copies of father's narcotics-use testing results, which were admitted into evidence at trial, showed that on February 6, 2023, father, by hair-follicle testing, tested positive for methamphetamine and marijuana, and father, by urinalysis, tested positive for amphetamine, methamphetamine, and marijuana.[20] Further, on July 12, 2023, father, by hair-follicle testing and urinalysis, tested positive for amphetamine, methamphetamine, and marijuana. The testing results also showed that father failed to participate in narcotics-use testing on March 7, 2023, and on November 1, 2023, father provided a urine sample that did not belong to him, which was then deemed a positive test result. *See In re A.L.S.*, 660 S.W.3d at 274.

From the evidence admitted at trial, the trial court could have reasonably inferred that father engaged in narcotics use during the pendency of the termination-of-parental-rights case. *See In re D.J.G.*, 2023 WL 3513143, at \*13; *In re D.D.M.*, 2019 WL 2939259, at \*4–5; *In re A.M.*, 495 S.W.3d at 580; *see also In*

---

[20] DFPS Investigator Harrison also testified that on the day H.J. entered DFPS's care in January 2023, father admitted to smoking marijuana.

*re D.L.W.W.*, 617 S.W.3d 64, 78–79 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("[W]e have [previously] concluded that illegal narcotics use may support termination under Texas Family Code section 161.001(b)(1)(E)."); *In re N.J.H.*, 575 S.W.3d 822, 831–32 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." (alteration in original) (internal quotations omitted)).

Thus, viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that father engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that father engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. *See id.*

Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that father engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. And any disputed evidence was not so significant that a fact finder could

not have reasonably formed a firm belief or conviction that father engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. *See id.*

Accordingly, we hold that the evidence is legally and factually[21] sufficient to support the trial court's finding that father engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. *See id. see also In re D.J.G.*, 2023 WL 3513143, at *12–16.

We overrule father's second issue.

Having held that the evidence is legally and factually sufficient to support the trial court's finding that father engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional

---

[21] Regarding factual sufficiency, we are aware of some cases holding that limited evidence of narcotics use is not factually sufficient evidence to terminate parental rights under Texas Family Code section 161.001(b)(1)(E). *See, e.g.*, *In re C.V.L.*, 591 S.W.3d 734, 752 (Tex. App.—Dallas 2019, pet. denied). But this is not a case involving limited narcotics use. In addition to the evidence discussed above, Stevens, the children's paternal grandmother, testified that she had known about father's narcotics use since 2019. Further, at the November 1, 2023 permanency hearing, Stevens testified that father had abused narcotics "for many years," including when H.J. was living with him. Further, the evidence at trial showed that father was convicted of the felony offense of possession of a controlled substance, namely methamphetamine, weighing less than one gram, in 2017. And father continued testing positive for methamphetamine during the pendency of the case. *See In re J.C.K.H.*, No. 01-22-00283-CV, 2022 WL 4540807, at *7–8 (Tex. App.—Houston [1st Dist.] Sept. 29, 2022, pet. denied) (mem. op.) (holding evidence of parent's narcotics use was factually sufficient to support trial court's finding that parent had engaged in conduct that endangered child's physical and emotional well-being).

well-being, we need not address the father's first and third issues in which he asserts that the evidence was legally and factually insufficient to support the trial court's findings that he knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or that he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (O); *In re A.V.*, 113 S.W.3d at 362 (only one predicate finding under Texas Family Code section 161.001(b)(1) necessary to support judgment of termination); *see also* TEX. R. APP. P. 47.1.

## B.   Best Interest of Children

In his fourth issue, father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the best interest of the children because there was no testimony about the children's desires, evidence regarding the children's present and future physical and emotional needs was scant, there was no evidence that father ever acted aggressively or violently toward the children, the condition of father's home was acceptable, father successfully completed certain requirements of his FSP, there was limited evidence of the foster parents' parental abilities, father testified that it was in the children's best interest to be returned to his care, father owned a trailer home and

was employed, and there was no evidence that father's narcotics use and criminal history endangered the children.

The best-interest analysis evaluates the best interest of the children. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the children in a safe environment is in their best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the children's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of father's parental rights was in the best interest of the children, we may consider several factors, including: (1) the desires of the children; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or

omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions.[22] *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

We note that the above listed factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the children's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122.

---

[22]    We noted that much of the evidence discussed below applies to multiple factors.

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. Children's Desires

When father's parental rights were terminated, H.J. was three years old and E.J. was one year old. Neither child directly expressed a desire as to whether he wished to be returned to father's care or remain in the current placement.

When there is no specific evidence of the children's desires or the children are too young to express those desires, a fact finder may consider evidence that the children are bonded with their foster family and receive good care in their current placement. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.); *In re L.M.N.*, 2018 WL 5831672, at *20.

DFPS caseworker Lozano testified that the children were doing well in their foster home, and it was the only home that E.J. had ever known. The children had never expressed that they were unhappy in their foster home. Both children were bonded with their foster siblings and foster parents. H.J. interacted with his foster siblings and the children's foster siblings helped the children with getting snacks or if they asked for something.

Child Advocates representative Smith similarly testified that the children were doing well in their foster home where they had been for more than one year. The children and their foster siblings had a true sibling relationship, and the children were bonded with their foster parents and foster siblings. The children's foster home was safe and stable, and their physical and emotional needs were being met in the home.

We note that Smith also testified that father and H.J. were bonded and father interacted with H.J. at visits. Father also testified about his bond with H.J. and his attempts to build a bond with E.J. during his visits with the child. However, father acknowledged that he was late to certain visits with the children, and the transcript from the November 1, 2023 permanency hearing, which was admitted into evidence at trial, also indicates that father had shown up thirty-minutes late to visits. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *18 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.) (considering parent either missed visits

49

with child or was late to visits with child in determining whether evidence sufficient to support trial court's best-interest finding).

Additionally, we note that although "[a] child's love for [his] natural parent is an important consideration in the best interest determination," "[e]ven where a child is attached to a parent, . . . [a] child's desire to be returned to the parent [is] not . . . dispositive of the best interest analysis," especially "if the parent has engaged in conduct dangerous to the child's well-being." *In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *9 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.); *see also In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (even though children appeared happy to see parent at visits, that was not dispositive of best-interest analysis).

### 2. Current and Future Physical and Emotional Danger

#### a. *Criminal Conduct*

A parent's criminal history is relevant in analyzing the present and future emotional and physical danger to the children and whether a parent can provide a safe and stable home for the children. *See In re D.J.G.*, 2023 WL 3513143, at *20; *see also In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *18–19 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6

(Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest). And "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child[ren]." *In re R.W.*, 129 S.W.3d at 739.

Father admitted that he had engaged in criminal conduct in the past. For instance, according to father, in 2022, he "spent four days in jail for a felony theft," and in 2021, he spent twenty-two days in jail related to "another misdemeanor." *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("Evidence of past misconduct . . . can be used to measure a parent's future conduct."). Further, father acknowledged that using narcotics, including methamphetamine, which he did before and during the pendency of this case, constituted criminal conduct. *See In re J.J.O.*, No. 04-18-00425-CV, 2018 WL 5621881, at *2 (Tex. App.—San Antonio Oct. 31, 2018, no pet.) (mem. op.) ("A parent's criminal activities . . . are relevant to a best interest analysis."). And Stevens, the children's paternal grandmother, testified that father had a "criminal history involving substance abuse[]."

Additionally, the trial court admitted into evidence several copies of judgments of conviction related to father. One judgment of conviction, entered on June 8, 2017, showed that father pleaded guilty to the felony offense of possession

of a controlled substance, namely methamphetamine, weighing less than one gram,[23] and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for 180 days. Further, another judgment of conviction, entered on April 3, 2018, showed that father had pleaded guilty to the misdemeanor offense of theft,[24] and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for thirty days. And a third judgment of conviction, entered on October 26, 2018, showed that father pleaded guilty to the misdemeanor offense of burglary of a vehicle,[25] and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for sixty-nine days. *In re Z.L.W.*, No. 01-12-00736-CV, 2013 WL 396270, at *5 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) (parent's pattern of committing criminal offenses constituted evidence of current and future danger to child); *In re A.M.*, 385 S.W.3d at 82 ("Evidence of past misconduct . . . can be used to measure a parent's future conduct.").

Still yet, we note that DFPS investigator Harrison testified that in August 2022, law enforcement officers were dispatched to a home due to a disturbance. At

---

[23]    *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a), (b) (offense constitutes state jail felony).

[24]    *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(2).

[25]    *See id.* § 30.04(a), (d).

the time, father had pushed his way into the home and assaulted mother, who was holding H.J., when she answered the door. Father was charged with the offense of criminal trespass because of his actions. *See In re D.L.R.*, No. 04-22-00811-CV, 2023 WL 3856732, at \*3 (Tex. App.—San Antonio June 7, 2023, pet. denied) (mem. op.) (trial court may consider whether there has been assaultive conduct in determining best interest of child); *see also In re J.B.M.*, No. 04-18-00717-CV, 2019 WL 1139858, at \*2 (Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.) ("Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children."). Additionally, on the day that H.J. was placed in DFPS's care, father admitted to Harrison that he used narcotics.

DFPS caseworker Lozano also testified that she was concerned about father's criminal history because it indicated that he lacked the ability to refrain from criminal conduct, and she noted that father had "picked up" a new criminal case in January 2023, but it was eventually dismissed. In 2021, father was "arrested for trespassing" and he went to jail "for [twenty-two] days."

b. *Narcotics Use*

Illegal narcotics use by a parent may constitute evidence of current and future danger to a child. *See In re D.J.G.*, 2023 WL 3513143, at \*23; *In re O.J.P.*, No.

53

01-21-00163-CV, 2021 WL 4269175, at *19–21 (Tex. App.—Houston [1st Dist.] Sept. 21, 2021, no pet.) (mem. op.) (considering evidence of parent's narcotics use in determining current and future danger to child); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct"); *In re S.R.H.*, No. 01-15-0714-CV, 2016 WL 430462, at *10–11 (Tex. App.—Houston [1st Dist.] Feb. 4, 2016, no pet.) (mem. op.) (parent's past narcotics use is indicative of instability in home environment); *Cervantes-Peterson*, 221 S.W.3d at 254–55 (illegal narcotics use while parental rights are in jeopardy may be considered endangering course of conduct critical to finding that termination is in child's best interest).

As previously noted, DFPS caseworker Lozano testified that DFPS's primary concern with father was his use of narcotics. Lozano stated that father had not consistently tested negative for narcotics use during the pendency of the case, and he did not attend all required narcotics-use testing while the case was pending. *See In re W.E.C.*, 110 S.W.3d at 239 (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics). According to Lozano, father also admitted to using narcotics during the pendency of the case, and he tested positive for

54

methamphetamine "all the way up until October [2023]."[26]  Further, at a narcotics-use test in November 2023, father provided a urine sample that was determined not to belong to him, resulting in a positive test result.  *See In re A.L.S.*, 660 S.W.3d at 276 (considering parent's attempt to "falsify drug tests" in holding evidence legally and factually sufficient to support finding termination in child's best interest); *see also In re E.A.R.*, 672 S.W.3d 716, 723 (Tex. App.—San Antonio 2023, pet. denied) (same).  Although Lozano acknowledged that father had tested negative for narcotics use in February 2024, she stated that father did not seem to have "a plan in place to help him prevent any relapses" and he had never "articulate[d] any[] . . . plan to keep himself sober."[27]  *See In re E.A.R.*, 672 S.W.3d at 723 (considering evidence parent had not successfully addressed his substance abuse issues in holding evidence sufficient to support trial court's best-interest finding).

The copy of the transcript from the November 1, 2023 permanency hearing, which the trial court admitted into evidence, also indicates that father did not consistently participate in narcotics-use testing during the pendency of the case. Lozano testified at that hearing that father was ordered to participate in narcotics-use

---

[26]   The children entered DFPS's care in January 2023.

[27]   Father testified that he had been ordered to attend AA and NA meetings, but they were "not for [him]," and he did not have an AA or NA sponsor.  Instead, he attended church to "seek [his] sobriety."  According to father, he had a "relapse prevention plan," but it was not written down.

testing in July 2023, and at that time, he tested positive for amphetamine, methamphetamine, and marijuana. After being ordered in July 2023 to participate in narcotics-use testing, father failed to do so consistently. According to Lozano, the first time that father reengaged in narcotics-use testing after July 2023 was on October 25, 2023. At that time, father tested positive for amphetamine, methamphetamine, and marijuana.

At trial, father testified that the biggest issue he needed to address was his narcotics use. Although father stated that he participated in narcotics-use testing during the pendency of the case, he noted that he did not show up for all the required narcotics-use testing. *See In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.) (parent's positive narcotics-use tests and failure to appear for other narcotics-use tests weighed in favor of trial court's best-interest finding); *In re I.W.*, 2016 WL 1533972, at *6 (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *see also In re C.A.B.*, 289 S.W.3d at 885 (fact finder could infer parent's failure to submit to court-ordered narcotics-use testing indicated she was avoiding testing because she was using narcotics). Further, father agreed that he had tested positive for narcotics use during the pendency of the case, but he stated that his last test result was negative for narcotics use. *But see In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *9 (Tex. App.—Houston [1st

Dist.] June 1, 2017, pet. denied) (mem. op.) (trial court "is not required to ignore a history of narcotics use merely because it abates as trial approaches"); *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue."). According to father, he stopped using methamphetamine in October 2023, but that would mean that father was using methamphetamine prior to October 2023 and during the pendency of the case.

The copies of father's narcotics-use testing results, which were admitted into evidence at trial, showed that on February 6, 2023, father, by hair-follicle testing, tested positive for methamphetamine and marijuana, and father, by urinalysis, tested positive for amphetamine, methamphetamine, and marijuana.[28] Further, on July 12, 2023, father, by hair-follicle testing and urinalysis, tested positive for amphetamine, methamphetamine, and marijuana. The testing results also showed that father failed to participate in narcotics-use testing on March 7, 2023, and on November 1, 2023, father provided a urine sample to be tested that did not belong to him, which was then deemed a positive test result. *See In re A.L.S.*, 660 S.W.3d at 274, 276; *see also In re E.A.R.*, 672 S.W.3d at 723.

---

[28]     DFPS Investigator Harrison also testified that on the day H.J. entered DFPS's care in January 2023, father admitted to smoking marijuana.

**3. Current and Future Physical and Emotional Needs, Parental Abilities, Plans for Children, and Stability of Proposed Placement**

a. *Children's Needs*

There is nothing in the trial record to establish that the children's physical and emotional needs differ in any respect to those of other children their ages. *See In re E.N.C.*, 384 S.W.3d at 808 (noting no evidence that children's needs differed from other children). However, the children need a safe and stable home. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs).

DFPS caseworker Lozano testified that father lived in a trailer home. Although father gave Lozano a copy of a lease agreement purportedly for the lot of land where his trailer home was located, the lease agreement was not signed, and it did not provide any information for the lessor. Lozano had requested that father provided her with information so that DFPS could verify that his trailer home was properly located on the lot of land, but father had not provided it.

Lozano also noted that during the pendency of the case, father was evicted from the property where his trailer home was located previously.[29]  And although father had more than a year to establish that he could provide a safe and stable home for the children, in Lozano's opinion, he had failed to do so.

As to the condition of father's trailer home, Lozano described it as "adequate," and she explained that it was clean and had electricity.  But it was setup for a single adult and did not appear to have any "accommodations or provisions for the children."

Lozano further explained that father had not provided adequate proof of consistent employment during the pendency of the case.  Father had provided her with one "pay stub" in October 2023 when he was "working for a company."  But the father had purportedly become self-employed.[30]  Father had provided Lozano with "invoices of job sites" where he had been working, but she was unable to verify the invoices provided.  Child Advocates representative Smith similarly testified that during the pendency of the case, father had not maintained stable, consistent employment; rather, his employment seemed to "ebb and flow."  *See In re B.M.S.*, 581 S.W.3d 911, 918–19 (Tex. App.—El Paso 2019, no pet.) (parent's employment

---

[29]  Father testified that he had not been evicted from the RV park named "Palms RV," where he previously parked his trailer home.  But Palms RV did tell him that he had to move his trailer home because he had not been paying rent.  Father then moved his trailer home to its current lot.

[30]  Father testified that he was self-employed as an electrician.

relevant to whether parent can provide stable and safe living situation); *In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *12 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (considering parent's lack of stable employment and lack of "verifiable income" in conducting best-interest analysis (internal quotations omitted)). Father's FSP required him to "maintain legal employment and provide [the DFPS] caseworker with proof of stable and consistent [employment] documentation such as paycheck stubs."

b. *Father's Supervision*

DFPS investigator Harrison testified that on January 12, 2023, a CPS investigator visited the children's maternal grandmother's apartment and saw narcotics paraphernalia "wax all over the house including pin[n]ed to [the] walls." (Internal quotations omitted.) There were also "open baggies of [m]arijuana" present.[31] Harrison then arrived at the apartment and found "the home environment to be deplorable." According to Harrison, "there was a smell of [m]arijuana and animal feces." H.J. was in the apartment with mother. Harrison stated that H.J. was wearing clothes that did not fit him. He had red marks on his face, and his clothes were "filthy." H.J. "had a foul smell emanating from his body[,] and his diaper was soiled."

---

[31] Mother's brother was arrested by law enforcement officers that day after admitting "to having dope" in the home. (Internal quotations omitted.)

60

Mother told Harrison that father knew that she was supposed to be supervised when having possession of H.J. In response, father, who had come to the apartment after mother called him, cursed at mother, telling her to "[s]hut the fuck up." (Internal quotations omitted.)

Father's FSP similarly stated that on January 12, 2023, H.J. was found to be living with mother in a home with "visible drug paraphernalia and baggies of marijuana inside." According to the FSP, father was not protective of H.J. because he left the child unsupervised with mother. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(C) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills, such as "supervision consistent with the child's safety"); *In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the custody of a parent who is unable or unwilling to protect them or attend to their needs because they have no ability to protect themselves."); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.) (parent's inability to provide adequate care for child, lack of parenting skills, and poor judgment may be considered when determining child's best interest); *In re C.M.W.*, No. 01-02-00474-CV, 2003 WL 579794, at *5 (Tex. App.—Houston [1st Dist.] Feb. 27, 2003, no pet.) (mem. op.) (children's basic needs include appropriate supervision).

As to the January 12, 2023 incident, father testified that he had "dropped [H.J.] off to visit" mother at the maternal grandmother's apartment. According to father, at drop off, he went inside and inspected the apartment. He felt that it was clean, and there were child locks on the cabinets and locks on the door. Mother confirmed in her testimony that father had dropped H.J. off at the maternal grandmother's apartment but stated that he had done so the night before so that mother could watch H.J. while father was at work on January 12, 2023—indicating that mother's visit with H.J. was not short and H.J. was with mother at the apartment for an extended period.

### c. *Father's Acts or Omissions*

A parent's failure to comply with his FSP supports a finding that termination of his parental rights is in the best interest of the children. *See In re J.S.B.*, 2017 WL 6520437, at *22; *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Here, father's FSP required him to "maintain stable housing that [was] sanitary and free from any drugs and hazardous objects" and "provide proof of housing with a lease agreement to" the DFPS caseworker. Father was also required to "maintain legal employment and provide [the DFPS] caseworker with proof of stable and consistent [employment] documentation such as paycheck stubs" and "provide any proof of documentation of any additional sources of income, such as governmental assistance." Additionally, the FSP

required father to "participate in a[n] [eight-]week parenting course that w[ould] assist him with understanding [the] children's growth and development" and he was required to "provide proof of [a] certificate of completion once he ha[d] received it." Further, father was required to "maintain monthly contact with [the DFPS] caseworker and provide [his] most up to date method of contact"; if his contact information changed, father was to "notify [the DFPS] caseworker with his updated information within [twenty-four hours]" of the change. Father was also required to "participate in all case related events[,] such as court hearings, meetings, conferences and visitation appointments with the children" and he was to "refrain from any illegal and criminal activity." And father's FSP required him to "participate in a substance abuse assessment and follow all recommendations," "participate in random hair follicle and urine analysis drug testing throughout the duration of the case," and "participate in a psychological assessment and follow all recommendations from the assessment."

Father testified that he had received his FSP, but he failed to participate in all required narcotics-use testing. And DFPS caseworker Lozano testified that father had not established a safe and stable home for the children or provided "proof of stable and consistent [employment]." Further, the transcript for the November 1, 2023 permanency hearing, which the trial court admitted into evidence, showed that father failed to attend that hearing. *See In re M.L.H.*, No. 04-21-00408-CV, 2022

63

WL 526501, at \*4 (Tex. App.—San Antonio Feb. 23, 2022, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support trial court's best-interest finding where parent "engaged in her service plan, [but] failed to successfully complete it").

### d. *Current Placement*

DFPS caseworker Lozano testified that the children were placed together in a foster home, where they were doing well. The children had been in the same foster home since they entered DFPS's care in January 2023. The children had never expressed that they were unhappy in their foster home.

As to H.J., Lozano testified that when he was first placed in the foster home, he had "a lot of redness and dry patches on his face" and on his back. There was "sort of like an eczema texture on his skin," and H.J. had "a lot of scars on his chest and on his shoulders, possibly due to scratching" his dry skin. H.J.'s foster mother told Lozano that she would put lotion on H.J. every day, and when Lozano saw H.J. about a week or two later, the redness and dry patches were cleared up.

Lozano further testified that at the time of trial, H.J. was three years old, and he was able to say words. He asked for what he wanted and what he needed. He had been fully potty trained, and he knew his numbers and colors. When Lozano visited the foster home, H.J. appeared very bonded with his foster siblings. At visits,

Lozano saw H.J. talking with his foster siblings and E.J. H.J. would share his toys, and his foster siblings would share their toys with him.

As to E.J., Lozano testified that the children's foster home was the only home that E.J. had ever known. E.J. was one year old at the time of trial and could walk. E.J. appeared bonded with everyone in the foster home.

As to the children's foster parents and home, Lozano explained that the children's foster parents did not have a criminal history and there was no evidence of domestic violence or narcotics use by the children's foster parents. The foster home where the children lived was a single-story home, with four bedrooms, an open living room, and a kitchen. According to Lozano, the foster home was the only safe and stable home that the children had ever known, and it would be detrimental to the children to remove them from their foster home.[32]

Child Advocates representative Smith also testified that the children were doing well in their foster home. The children's foster parents were planning birthday celebrations for the children's birthdays. H.J. had been enrolled in a daycare

---

[32] The transcript from the November 1, 2023 permanency hearing, which the trial court admitted into evidence, also indicates that they children were doing well in their foster home. The children were "meeting their milestones and achieving any goals that their age would require." At the time of the permanency hearing, H.J. was two years old, and he was attending a daycare program during the week. On weekends or holiday breaks, the children's foster parents would take the family to the lake, to the beach, to the pool, or to the park. The foster parents involved H.J. in recreational activities that were appropriate for his age.

program. H.J. received a bike and a helmet from his foster parents as a Christmas present, and the foster parents planned on taking trips with the children. According to Smith, the children's emotional and physical needs were being met in their placement.

Smith also explained that in their foster home, the children shared a bedroom. E.J. slept in a crib with no pillows for his safety. H.J. had a toy chest in the bedroom, and E.J. had baby toys and chewing toys because his teeth were coming in.

According to Smith, the children were bonded with their foster parents and foster siblings, and the children's foster parents intended to adopt the children. *See In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at *14 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) ("A child's bond with his placement family implies that the child's desires would be fulfilled by adoption by the placement family."). In Smith's opinion, the children's foster home was the only safe and stable home that they had ever known, and Smith believed that it would be detrimental to the children if they were removed from the foster parents' care.

The children's foster dad testified that, at the time of trial, the children had been living in their foster home for about fourteen months. The children called their foster parents "Mom and Dad," and the foster parents loved the children. *See id.* at *21 (child referred to placement family as "[m]om" and "[d]ad" (internal quotations omitted)); *In re G.J.A.*, No. 13-22-00209-CV, 2022 WL 3092177, at *8 (Tex.

66

App.—Corpus Christi–Edinburg Aug. 4, 2022, no pet.) (mem. op.) (in holding sufficient evidence to support trial court's finding termination of parental rights in children's best interest, considering evidence showed that children were thriving in current placement, placement was meeting all the children's needs, children called their foster parents "mom and dad," and children were bonded with foster family (internal quotations omitted)).

As to H.J., the foster dad testified that when H.J. entered the foster parents' care, he had minor rashes on his face and body, so the foster parents took him to the doctor, and the children's foster mother used "lotions and other things" to heal the rashes. H.J. also had anger issues when he first entered the foster parents' care; he would throw himself down, bang his head, and hit stuff. H.J. still did that "a little bit here and there," but "for the most part, he[] [was] doing really, really well" in the home. The foster dad stated that H.J. was an intelligent child.

As to E.J., the foster dad testified that E.J. entered the foster parents' care as a newborn, and the foster home was the only home that E.J. had ever known. E.J. was a happy child.

While the children had been in the foster parents' care, the foster parents had attended all court hearings and family group conferences. The foster parents had also taken the children to their scheduled visits with mother and father. The children's foster dad noted that he was employed "build[ing] process control

systems," and his income was sufficient to support the family. *See In re M.R.H.*, No. 07-15-00089-CV, 2015 WL 3463025, at *4 (Tex. App.—Amarillo May 26, 2015, pet. denied) (mem. op.) (considering as evidence of foster family's ability to care for child that foster parent was gainfully employed). The foster parents owned their home, which sat on a couple acres of land.

The children's foster dad also noted that he and the foster mother had two biological children, who were bonded with the children. They were the children's siblings. If mother's and father's parental rights were terminated, the foster parents wanted to adopt the children, which the foster dad believed was in the children's best interest. The foster parents planned on raising the children and loving them. They hoped to start contributing to a college fund for the children once they were adopted. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were placed in adoptive home with foster parents who wanted children to continue living with them); *see also In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.]

2014, no pet.) ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest.")

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of father's parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of father's parental rights was in the best interest of the children. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of father's parental rights was in the children's best interest, or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of the children. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of father's parental rights was in the best interest of the children. *See id.*

We overrule father's fourth issue.

### Managing Conservatorship

In his fifth issue, father argues that the trial court erred in appointing DFPS as the sole managing conservator of the children because DFPS "failed to introduce

sufficient evidence at trial that demonstrated any specific, identifiable behavior[s] on [father's] part that would significantly impair the children's physical health or emotional development" and "there was legally and factually insufficient evidence introduced at trial to support naming DFPS as managing conservator."

The Texas Family Code provides that "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE ANN. § 161.207(a); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8 (Tex. App.— Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, [Texas] Family Code section 161.207 governs the appointment of a managing conservator."). Generally, we review a trial court's conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

Importantly, an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to his children. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.). A parent with no legal rights with respect to his children lacks standing to attack the portion of the

70

trial court's order appointing DFPS as the sole managing conservator of the children. *See In re A.L.J.*, 2019 WL 4615826, at *9.

Here, we have overruled father's complaint that the trial court erred in terminating his parental rights to the children. *See In re J.H.*, 2023 WL 2169952, at *27; *see also In re A.L.J.*, 2019 WL 4615826, at *9 ("Once we overrule a parent's challenge to the termination order, the trial court's appointment of [DFPS] as sole managing conservator may be considered a 'consequence of the termination' . . . ."); *In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights."); *Quiroz v. Dep't of Fam. & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator where evidence sufficient to support termination of parent's rights). Thus, the trial court's order terminating father's parental rights divested him of his legal rights and duties to the children. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re J.H.*, 2023 WL 2169952, at *27; *see also In re A.L.J.*, 2019 WL 4615826, at *9 ("Because we have overruled [parent's] challenge to the portion of the trial court's order terminating her

parental rights, the order has divested [her] of her legal rights and duties related to [the children].").

Having no legal rights with respect to the children, we hold that father lacks standing to challenge the portion of the trial court's order appointing DFPS as sole managing conservator of the children. *See In re J.H.*, 2023 WL 2169952, at *27; *In re A.L.J.*, 2019 WL 4615826, at *9 ("[Parent] d[id] not have standing to challenge the portion of the order appointing [DFPS] as permanent managing conservator of the children because any alleged error could not injuriously affect her rights.").

We overrule father's fifth issue.

## Conclusion

We affirm the order of the trial court.[33]


Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

---

[33] On October 25, 2024, father filed a motion to strike the appellee's brief filed by DFPS because it "was filed past the time allotted by the Texas Rules of Appellate Procedure." The result of this appeal is the same whether or not this Court considers DFPS's brief. Accordingly, we dismiss father's motion to strike as moot.